## Neely's Estate.   Hooton's Appeal.

*Will—Heirs—Intestate laws—Husband and wife.*

Where the subject of a testamentary gift is personalty, a limitation to the heirs of the first taker, either substitutionally or by way of succession, means the persons entitled under the intestate laws, and in Pennsylvania this will include a husband.

*Trusts—Will—Purchase by trustee from cestui que trust—Life estate.*

Testator bequeathed to a trustee ten thousand dollars, to invest and pay over the income thereof to a cestui que trust during the term of her natural life, and at her decease to pay the one half of said sum to her heirs and the other half to such charitable institution as she might by her last will direct. After testator's death the trustee purchased from the cestui que trust for two thousand dollars her right in the half of the legacy which was to go to the heirs, and subsequently purchased from her for one thousand dollars all the right to the other half. *Held*, that the rights purchased by the trustee ceased at the death of the cestui que trust, and that as against her heirs the sum paid to her could not be deducted.

In the above case after the death of the cestui que trust, her husband assigned to the trustee without consideration " any and all interest " which " as a lawful husband " he had in her estate. It did not appear that, at the time the assignment was made, the husband fully understood what his rights were in his wife's estate. *Held*, that the assignment could not be sustained.

Argued Jan. 25, 1893.   Appeal, No. 151, July T., 1892, by Francis C. Hooton, from decree of O. C. Phila. Co., Oct. T., 1891, No. 428, dismissing exceptions to adjudication in Jas. S. Neely's estate.   Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, MCCOLLUM, MITCHELL and DEAN, JJ.

Audit of executor's account.

The following adjudication was filed by PENROSE, J.:

"The decedent died May 25, 1889.   By his will with codicil, executed May 16, 1889, and proved May 29, 1889, he gave $2,500 to his brother's widow; $2,500 to Robert Thompson Neely; $2,000 to William Neely; $2,000 to Samuel Neely; $2,000 to Robert Neely; $5,000 to Joseph I. Graham; $5,000 to Isaac Graham; $5,000 to Francis C. Hooton, in trust for John Steiner for life, and at his death to his grandchildren; $2,500 to Charles H. Areson; $5,000 to Francis C. Hooton, Esq., his attorney; $10,000 to Francis C. Hooton, in trust for Ellen Vir-

ginia Bleloch for life, and at her death $5,000 to her heirs, and
$5,000 to such charitable institutions as she should by will ap-
point; $2,000 to the West Chester Public Library; $5,000 to the
Church of the Holy Trinity, West Chester; and the residue,
after provisions for purchase of burial lot, erection of vault, etc.,
and creation of trust for keeping the same in repair, etc., to
Francis C. Hooton, his attorney, absolutely and in his own
right, and appointing him also his executor.

"The will having been executed less than a calendar month
before the death of the testator, the gifts to charities, including
those intended to take effect through the appointment of Ellen
V. Bleloch, failed, except so far as the residuary legatee may
see fit to waive the benefit of the statute.

"Ellen Virginia Bleloch died, as represented to the court,
Oct. 26, 1891, intestate, leaving a husband, Henry W. Bleloch,
and a father and mother, Anna B. Jones and Benjamin F. Jones,
and the $5,000 directed to be paid at her death to her 'heirs'
were claimed by her mother under the terms of the limitation
and by virtue of assignments from the husband and father.
Her right was denied by the accountant, who claimed in his
own behalf under an assignment of prior date by the husband,
and also under an assignment by Ellen Virginia Bleloch in her
lifetime.

Ellen Virginia Jones became the wife of Henry W. Bleloch,
December 25, 1884, being then about twenty-one years of age,
and the husband perhaps a year older.  She had, as the latter
was aware, been leading an immoral life, and seems, moreover,
to have been addicted to habits of intemperance.  As might
have been expected, the marriage did not accomplish her ref-
ormation, and, after living with her for a few weeks, the hus-
band left her, subsequently going west, where he remained for
several years.

"The testator, James S. Neely, then a boy of eighteen or nine-
teen years of age, formed an intimacy with her about two years
before his death, living with her during part, if not all, of the
time, at the house of her mother, Mrs. Anna B. Jones.  The
mother was aware of the marriage to Bleloch, but she had heard
the daughter say at one time that she intended to get a divorce
from him, and accepted her assertion that she was married to
Neely without deeming it necessary to ask any questions.

" The testator did not attain his majority until January, 1889. His health broke down soon afterwards, and in the early part of May, his physicians having declared that death was imminent, notice was sent to his friends in West Chester, and, as the result, Mr. Hooton, who had for some time been his counsel, called upon him at the house of Mrs. Jones, where he then was, and drew his will which was there executed.  Nine days afterwards he died.

" The provision made for Ellen V. Bleloch was as follows : ' I give, devise and bequeath to Francis C. Hooton, ten thousand dollars, to invest the same and pay the interest and income thereof, to Ellen Virginia Bleloch, during the term of her natural life, and at her decease pay the one-half of said ten thousand dollars to her heirs, and the other half thereof to such charitable institution or institutions as she may by her last will direct.'

" On the 7th of April, 1890, the accountant, Francis C. Hooton, Esq., purchased from Ellen V. Bleloch, for $2,000, all her right to the half of the legacy, which, at her death, was to go to the heirs, taking from her an assignment of that date which was duly acknowledged and recorded ; and on the 1st of September, 1891, he purchased from her, for $1,000, all her right to the other half, which at her death the will directed should go to such charitable institutions as she should appoint by will.  This assignment was also acknowledged and recorded.

" The purchase of the first half seems to have been made under the idea that by reason of the limitation to her heirs, Mrs. Bleloch was the owner of the entire interest in the legacy, as she unquestionably would have been if the life estate and gift in remainder had both been of the same nature.  But as the will, which the purchaser himself had prepared, created a trust, with active duties on the part of the trustee, during the life of the beneficiary (intended, no doubt, by the testator, who, to his sorrow, was fully aware of her frailties, for the very purpose of affording her some protection from herself), there could, under well settled principles (Bacon's Appeal, 7 Smith, 504), be no coalescence with it of the remainder to her ' heirs.'  If indeed Mrs. Bleloch had been the owner of the entire interest, the purchase from her by her trustee, for $2,000, of a legacy of $5,000, would, manifestly, have given him no title.  It could only have

operated as a payment on account of the sum held for her, and this, Mr. Johnson stated, was all that is now claimed for it.

" The auditing judge, however, is of opinion that the right purchased by Mr. Hooton ceased at the death of the beneficiary, and that as against her heirs the sum paid to her cannot be deducted.

" After the testator's death had put an end to her association with him, marital relations were for a short time resumed between Ellen V. Bleloch and her husband; but for reasons which are set forth in his testimony before the auditing judge, which furnished the most ample justification for his so doing, he again left her.  This was but a few weeks before she died.

" On the 3d of November, 1891, the husband, who did not know and had never met the accountant, wrote him the following letter :

" ' My attention was called to the death notice of Mrs. Ella J. Neely, in the Public Ledger of Oct. 28th last.  I am also informed that she claimed to be the wife of one James Neely, of whose estate I am told you are the executor, that she was married to said Neely in the city of Baltimore, Md.

" ' In justice to other possible heirs, I feel it my duty to inform you that she never could have been his wife, she having been married to me Dec. 25, 1884, by Rev. Nicholas Gehr, at his residence on 6th street, above Girard Ave., this city, which fact the records of the health office of this city will abundantly prove.'

" The reply to this was as follows : ' I am in receipt of your letter of November 3d, A. D. 1891.  I very much wish you would at once come to see me.  I will be away from home on Thursday the 5th inst., but will return that evening.  You did right in at once putting yourself in communication with me. In consequence of actions of other parties I desire to see you, as I have said, at as early a period as may be convenient.  My office can easily be found.  Inquire for Col. Hooton's office.'

" As requested by this letter, Henry W. Bleloch went to West Chester on November 6, 1891, having no knowledge, it would seem, that he had any possible interest or claim under the will of the testator, and called at the office of the accountant.  In the meantime, the latter had considered the expediency of purchasing the interest of his expected visitor, as husband,

and, therefore, 'heir' of Ellen V. Bleloch, and had consulted with R. T. Cornwell, Esq., a well known member of the bar of Chester county, upon the subject.

"What occurred is thus stated by Mr. Hooton, the accountant: 'That gentleman came into my office and asked if this was Mr. Hooton. I said it was. He said I am Mr. Bleloch. I said, I am very glad to see you, Mr. Bleloch. He sat down and talked a few minutes, and then I said: "Mr. Bleloch, I have a personal interest in some matters in connection with this estate, in which you, perhaps, are interested, and it occurs to me that any conversation which takes place with you in reference to those interests should be conducted by somebody else than myself. I am a member of the bar, but we lawyers, when we have a matter of our own, usually call in somebody else to look after it; and my friend, Captain Cornwell, usually attends to my matters; and if you have no objection I will 'phone for Captain Cornwell to see if he can come up." I went to the 'phone and called him up, and he said he would come at once, and in five minutes or less he was there. I introduced Captain Cornwell to this gentleman, Mr. Bleloch. I had already exhibited to Captain Cornwell the letter which Mr. Bleloch had written to me, and I handed Captain Cornwell that letter and said, "Now, Captain, you and Mr. Bleloch go on and discuss this matter;" and I sat and looked on while they discussed it. Mr. Bleloch gave a very long history of the relations between himself and his wife, and of his wife's character. He and Captain Cornwell discussed the question of his rights to letters of administration. He said he had not fully made up his mind as to whether he would contest the grant of letters of administration to Mrs. Jones. He said he believed he could win it. He said that his mother, who he told us was his stepmother, was, however, very much opposed to it; that his father and family had been terribly disgraced by his marriage to this woman, and that his stepmother advised him that the best thing he could do was to let the whole thing go, and let it all die out. Captain Cornwell stated the history of the two assignments, and the two assignments were there, and the Captain said I had told him I owed on the second assignment $500. Mr. Bleloch said that this money which Neely had left to his wife was the price of adultery, and that as it appeared that I

had paid Mrs. Bleloch for those legacies he was very glad that it was not going to the Joneses, and that he would be glad to make an assignment to me. He said that he would like the $500 which had not been paid to go to some charitable objects.'

"Captain Cornwell, who was also examined as a witness on behalf of the claim of the accountant, testified that, after hearing the account given by Henry W. Bleloch of his married life: 'I told him if this was true, in my judgment, he was entitled to administer on his wife's estate, and he was entitled as a distributee under the will of Mr. Neely. I told him he would have to give security, if he attempted to have the letters revoked here in Philadelphia. He said he thought he could give security, and he thought that by reason of political relations here he could get influence enough to get the letters revoked.'

"In the course of the interview, Col. Hooton took down the act of assembly relating to the loss of the rights of a husband in his wife's estate in case of desertion. This fact was forgotten by Col. Hooton, but was testified to by Mr. Bleloch, whose recollection in this respect was confirmed by Captain Cornwell. Captain Cornwell testified, however, that he had given it as his opinion when the act was referred to that there had in this case been no desertion, and that the husband had his full marital rights as to any estate his wife might have. 'He then said,' continued Captain Cornwell, 'that his mother, or stepmother, I will not be confident as to that—certainly his own family were very much opposed to his making any contest, because it would bring his whole life and hers into court; and they wanted him to let the whole thing go; and he said he did not want a cent of this money, because he regarded it as the price of his wife's adulterous relations. He said he would be perfectly willing to transfer it all to Col. Hooton, and he might apply it to any purpose he chose, or whatever he was entitled to might be applied to charitable institutions.'

"Captain Cornwell was called away by other business, and after he had gone, Col. Hooton asked Mr. Bleloch if he was willing to execute an assignment to him, and this having been answered, as Col. Hooton asserts, affirmatively, he prepared the paper and it was then executed and witnessed, the witnesses not having been present and only hearing the declaration of the assignor that the signature was his.

" The following is a copy of the instrument : ' Know all men by these presents, that I, Henry W. Bleloch, the husband of Ellen V. Bleloch, late of the city of Philadelphia, deceased, who had and possessed, under the will of James S. Neely, deceased, certain interests which she sold and assigned to Francis C. Hooton, of the borough of West Chester and state of Pennsylvania, do, for and in consideration of the sum of one dollar to me in hand paid, the receipt of which I hereby acknowledge, assign, transfer and set over to the said Francis C. Hooton, any and all interest which I as a lawful husband of the said Ellen V. Bleloch may have or may have had in her said estate, and I hereby release, quit-claim and forever discharge the said Francis C. Hooton, from the payment of any and all sum or sums of money to me on account thereof, and from all accounts and reckonings for or on account of the same.' (With signature, seal and witnesses.) Acknowledged same day and recorded in the recorder's office of Chester county, Nov. 23, 1891.

" That where the subject of a testamentary gift is personalty, a limitation to the heirs of a first taker, either substitutionally or by way of succession, is understood as meaning the persons entitled under the intestate laws, and that this, in Pennsylvania, will include a husband, is almost too well settled to require the citation of authority : See Patterson v. Hawthorn, 12 S. & R. 112 ; Gibbons v. Fairlamb, 2 Casey, 217 ; Eby's Appeal, 3 Norris, 241, etc.

" The provisions of the act of 1855 with regard to a husband who has by desertion without cause forfeited his right as distributee are, however, to be read into the intestate laws, just as are the provisions of the acts relating to adoption : Johnson's Appeal, 7 Norris, 346. A husband who has so deserted takes nothing, and in ascertaining who are the heirs of the wife he is simply looked upon as not in existence.

" The ' heirs ' of Ellen V. Bleloch, if her husband's conduct had brought him within the operation of the act of 1855, would be her father and mother, and the father having assigned his interest to the mother, she would now be entitled, exclusively, under the gift in this will. But, as already stated, the conduct of the daughter fully justified the husband in leaving her, and there having, therefore, been no forfeiture of his rights, he was the person to whom the legacy became payable.

" Mr. Todd, it is true, sought to prove by the testimony of the mother that when the will was written the testator asked if the word ' heirs ' would include the husband, and was assured that it would not; but it is too plain for argument that the evidence (which was most emphatically contradicted) was incompetent to contradict the writing or show that the words were not intended to be used in their ordinary sense.

" The claim of Mrs. Jones on this ground was not pressed, but it was rested upon an assignment to her, dated November 24, 1891, by the husband, who then and now repuditates the assignment to the accountant and denies that it passed the interest to which he was entitled as heir under the will of the testator.

" The accountant held this legacy as trustee no less for the heirs of Ellen V. Bleloch than he did for her ; and the policy of the law which makes voidable the purchase of a trustee from cestui que trust, irrespective of adequacy of consideration, bona fides of the transaction, would seem, a fortiori, to apply to a gift or assignment without consideration : See Vaughton v. Noble, 30 Beav. 39.   Certainly to support such a gift or voluntary assignment, if it could be supported, it would have to be shown by evidence of the clearest, most unequivocal character, not only that the cestui que trust fully understood his rights but that he intended to transfer them to the trustee for his individual benefit.   In this respect the proof falls short of the requirement.   The parties were not dealing on equal terms.   The cestui que trust was a young man, having no knowledge of law, informed of his rights—so far as he was informed of them at all—for the first time, acting under the impulse of bitterness of feeling towards his wife and all the members of her family, and shrinking with natural loathing from anything like participation in moneys earned by her infidelity.   He was dealing with an experienced lawyer, who had formed his plans in advance, and who called in another lawyer to represent him in the transaction.   Captain Cornwell undoubtedly acted with entire fairness, and explained, as he believed, fully and accurately, what the rights of the cestui que trust were, and expressed the opinion that they were not taken away by the act which was read to him.   But why was the act read, and why were the assignments made by his wife in her lifetime exhibited to him ?   Evi-

dently, notwithstanding what was said, he was not satisfied in his own mind that he had any claim and that his case did not fall within the act, the terms of which, taken literally and as a layman would understand them, appeared to be so directly applicable. He had gone to the trustee's office upon an entirely different errand, and there was no time for deliberation. An important topic, if not the chief topic of the conversation and discussion was as to his right to administer upon the estate of his wife and thus to receive the $500, which the trustee owed her under her last assignment to him. Even this, while he was unwilling to receive it for his own benefit, he desired, insignificant as it was, to have devoted to charitable purposes; that he wished the $5,000 legacy to go in a different direction, and that he deliberately gave it to the trustee—an utter stranger whose acquaintance he had made upon that very day—knowing that he had the right to dispose of it, is incredible, apart from the positive assertion which he now makes that he did not know or believe that he had any such right.

"But the trustee does not contend that the assignment to him was by way of gift; on the contrary he asserts that though the consideration expressed was nominal, the actual consideration was the desire of the cestui que trust to keep the legacy from his wife's family, and the fact that the trustee had paid $2,000 for her interest in her lifetime, not to speak of the consideration imposed by the sealing of the instrument. Two thousand dollars for a legacy of five thousand, even if it had not been a past consideration and paid to a stranger to the assignment, certainly will not support the claim of the trustee against the cestui que trust. The desire to exclude the family of the wife is equally inefficacious, and neither it nor the seal is sufficient to prevent the cestui que trust or those claiming under him, if he should, as he did, afterwards change his mind and transfer his right to the very persons towards whom he had before been so hostile.

"But the assignment itself is all that is necessary to show that the cestui que trust did not know that he had any rights under the will of the testator. It refers to the sale by the wife of 'certain interests' 'had and possessed' by her, which she had sold and assigned to the trustee, but not to any belonging to the husband as 'heir' and then assigned. It shows, more-

over, that the assignment was not in accordance with what both trustee and his counsel testified was the desire of the cestui que trust as to $500, owing by the trustee to the estate of Ellen V. Bleloch, under her last assignment, viz.: that it should be devoted to charitable purposes.   The assignment is of all interest of the assignor in the estate of his wife, including, of course, this debt, to the trustee, absolutely and in his own right.

" All that has thus been said is perhaps unnecessary in view of the fact that the assignment relied upon by the trustee is not, and does not profess to be of the interest of the assignor in the estate of the testator, but is confined, in express terms, to his interest in the estate of his wife, and the release is only from the payment of any ' and all sum or sums of money on account thereof, and from all accounts and reckonings, for, or on account of the same.'   How can this affect the right of the assignor in any other estate ?

" The legacy of $5,000 to the heirs of Ellen V. Bleloch is awarded to Anna B. Jones, assignee of Henry W. Bleloch, with interest from October 26, 1891.

" After the execution of the assignment of November 6, 1891, the accountant wrote to the assignor the following letter, the object of which he did not explain in his testimony before the auditing judge: ' I wish you would come up to West Chester some day in the early part of next week.   I want to get from you a full account of certain affairs.   As I suppose you have to work for your living I do not desire you should be at the expense of this visit.   I will pay your car fare and also pay you for the loss of the work of the day.   Come either on Monday, Tuesday or Wednesday, as may be most convenient.'

" The reply was as follows: ' Replying to yours of Nov. 27, 1891, would say, having no claim on the estate in dispute, I cannot see that an interview with you would be of any consequence.'

" The assignment to Mrs. Jones was dated Nov. 24, 1891."

Exceptions to the adjudication averred that the court erred: (1) in awarding to Anna B. Jones the sum of $4,750, with interest from Oct. 27, 1891; (2) in not finding that the interest of Henry W. Bleloch, on said legacy of $4,750, was duly assigned to exceptant; (3) in not awarding said legacy of $4,750, with interest, to this exceptant; (4) in finding that the assign-

ment by said Bleloch to exceptant was not of the interest of the assignor in the estate of the testator; (5) in finding that Bleloch did not know that he had any rights under the will of the testator; (6) in not finding that Bleloch was fully aware of his interest in the legacy bequeathed to the heirs of his wife, and that he meant to release all interest therein for reasons satisfactory to himself and sufficient to the law; (7) in not finding that the said Bleloch was fully aware of all the facts connected with his interest in the legacy bequeathed to the heirs of his wife; (8) in not finding that the assignment by said Bleloch to said exceptant was made to said exceptant, as an individual holding the position of residuary legatee under the will of the testator.

The exceptions were dismissed, in an opinion by HANNA, P. J., adopting the opinion of the auditing judge.

*Errors assigned* were (1–8) overruling exceptions, quoting them.

*John G. Johnson* and *William T. Barber*, for appellant, cited: Chorpenning's Ap., 32 Pa. 315; Fisher's Ap., 34 Pa. 29; Campbell v. McLain, 51 Pa. 200; Grim's Ap., 105 Pa. 375; Hill on Trustees, 4th. Am. ed. 900; Adams's Equity, 4th Am. ed. 204; Bisph. Eq., 2d ed. 298, 515; Hall's Ap., 40 Pa. 409; Snyder v. May, 19 Pa. 235.

*M. Hampton Todd*, for appellee, cited: Patterson v. Hawthorn, 12 S. & R. 112; Gibbons v. Fairlamb, 26 Pa. 217; Eby's Ap., 84 Pa. 241; Comly's Est., 136 Pa. 153; Spencer and Newbold's Ap., 80 Pa. 317.

PER CURIAM, February 6, 1893:

We affirm this case upon the opinion of the learned auditing judge.

The decree is affirmed, and the appeal dismissed at the costs of the appellant.